**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**
**MARIA DANILUK,**                                  :
                                                    :
                                    **Plaintiff,**   :                **COMPLAINT**
                                                    :
                       **-against-**                 :
                                                    :                **JURY TRIAL DEMANDED**
**COLUMBIA GRAMMAR AND PREPARATORY** :
**SCHOOL, SHARONAH VOLKOWITZ AND DR.** :
**RICHARD SOGHOIAN,**                               :
                                                    :
                                    **Defendants.**  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**

Maria Daniluk ("Plaintiff" or "Daniluk"), by her attorney, complaining of defendant Columbia Grammar and Preparatory School ("Defendant" or "CGPS"), Sharonah Volkowitz and Dr. Richard Soghoian, respectfully alleges upon information and belief as follows:

## INTRODUCTION

1.      This is an action to remedy illegal age, sex and religious discrimination and retaliation under Title VII, the New York State Human Rights Law, NY Exec. Law, §§290, et seq. ("NYS HRL"); and the New York City Human Rights Law, NYC Admin. Code §§8-101, et seq. ("NYC HRL").

2.      Plaintiff seeks declaratory and injunctive relief, compensatory, monetary and punitive damages, together with attorneys' fees.

## JURISDICTION AND VENUE

3.      Jurisdiction of this Court is pursuant to 28 U.S.C. §§1331, 2201. Jurisdiction over the State and City law claims is pursuant to 28 U.S.C. §1367 and the Court's pendent jurisdiction.

4.      Venue is founded in the Southern District of New York pursuant to 28 U.S.C. §1391(b) because Defendant is located in New York County and the acts complained of occurred therein.

1

5.      Plaintiff previously filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission, with Notice of a Right to Sue issued on May 18, 2015.

6.      Pursuant to New York City law, Administrative Code 8-502(c), copies of this Complaint will be served on the New York City Commission on Human Rights and the New York City Corporation Counsel.

## PARTIES

7.      Maria Daniluk is a 62 year old female who was a long term employee of CGPS until her illegal termination on May 13, 2014.

8.      At all times relevant to this Complaint, CGPS was and is a domestic not for profit corporation organized under the laws of New York.

9.      At all times relevant to this Complaint, CGPS was and is an educational corporation organized under the laws of New York.

10.     At all times relevant to this Complaint, CGPS was and is a corporation organized under the laws of New York.

11.     At all times relevant to this Complaint, CGPS was the employer of Ms. Daniluk.

12.     At all times relevant to this Complaint, Sharonah Volkowitz was an employee of CGPS and the supervisor of Ms. Daniluk.

13.     At all times relevant to this Complaint, Dr. Richard Soghoian was is the Headmaster of CGPS an employee of CGPS and the supervisor of Ms. Daniluk.

14.     At all times relevant to this Complaint, CGPS had and has an actual place of business at, among other locations, 5 West 93rd St., New York, NY and 36 West 94th St., New York, NY.

## FACTUAL BACKGROUND

15.     This claim arises from, among other things, actions and statements made by Sharonah

Volkowitz, the CGPS Chief Financial Officer and Ms. Daniluk's direct supervisor, Dr. Richard J. Soghoian, the CGPS Headmaster, and those acting on behalf of Ms. Volkowitz and Dr. Soghoian, and by their (individual and collective) targeting of Ms. Daniluk, which constitutes, among other things, illegal age, sex and religious discrimination, as well as illegal retaliation under applicable federal, New York state and New York City law.

16.     At the time of her illegal termination, Ms. Daniluk was the Database/Accounts Payable Manager at CGPS.

17.     Ms. Daniluk had started at CGPS as an Assistant to the Business Manager in 2002 and had received steady promotions and increased responsibilities during her 12 year tenure. Among other things, Ms. Daniluk revamped CGPS business practices, helped create a computer system to record deliveries and an on-line system for Purchase Orders, reorganized the mail system after the business office moved, organized a new way to print the school directory, redesigned the teacher reimbursement system and kept records of professional reimbursements to keep better track of teacher spending. Her skill set was so helpful that she took on additional duties, most recently involving database management.

18.     As a result of her work, Ms. Daniluk repeatedly had good reviews and performance ratings with an increased workload.

19.     Ms. Daniluk fully and properly performed her duties throughout her work for CGPS.

20.     Prior to her termination, CGPS and Ms. Volkowitz had not issued any disciplinary or warning letters to Ms. Daniluk.

21.     Indeed, CGPS did not attach any disciplinary letters or memos from prior to Ms. Daniluk's termination to its U.S. Equal Employment Opportunity Commission position statement.

22.     Prior to her termination, CGPS and Ms. Volkowitz had not sought to terminate Ms. Daniluk and it was expected that Ms. Daniluk would continue her work with CGPS for the 2014-15 school year.

23.     Just prior to her termination, Ms. Daniluk received a letter dated March 15, 2014 from Dr. Richard J. Soghoian, the CGPS Headmaster, stating his "own very strong appreciation for your outstanding service and commitment during the past year….This note comes with my best wishes for continued success."

24.     Dr. Soghoian had written similar letters to Ms. Daniluk in previous years based on her excellent performance.

25.     Ms. Volkowitz is an Orthodox Jew.

26.     Ms. Daniluk is Catholic.

27.     Ms. Volkowitz reported directly to the CGPS Headmaster.

28.     Ms. Daniluk understood that despite her hard work and workplace success, Ms. Volkowitz wished to replace her with a younger Orthodox Jewish employee.

29.     Previously, Ms. Volkowitz advised Ms. Daniluk that she planned to hire an assistant.

30.     In response, Ms. Daniluk recommended a colleague as a possible hire.

31.     However, Ms. Volkowitz stated her plan to hire an Orthodox Jew because they have good working skills and that she planned to do a good deed by hiring a Jewish woman because CGPS was such a good place to give birth to babies and would make it convenient for another Jewish woman to have Jewish babies.

32.     Ms. Volkowitz had worked at CGPS and during her time there had given birth to four children.

33.     No information, such as a resume, was requested of Ms. Daniluk or her colleague.

4

34.     Upon information and belief, Ms. Volkowitz contacted a specific business for employment referral and requested a young Orthodox Jewish woman.

35.     Upon information and belief, CGPS and/or Ms. Volkowitz did not advertise or post any job announcement for the open position.

36.     Upon information and belief, only Orthodox Jews were considered.

37.     Ms. Volkowitz and CGPS hired Leah Shleifstein, a young Orthodox Jew and a graduate of Touro College, as Assistant Controller.

38.     Ms. Daniluk feared for her job since she was not an Orthodox Jew.

39.     When Ms. Daniluk was hired, she was unable to take sick or vacation days for her first three months of employment. In contrast, Ms. Volkowitz allowed Ms. Shleifstein to take days off.

40.     There were other examples of illegal and wrongful behavior, which include but are not limited to:

    a.  Telling Ms. Daniluk that Jewish prayer makes them (Ms. Volkowitz and other Jews) Holy and that Jewish people have a special relationship with God and that they are chosen people.

    b.  Ms. Volkowitz stated that people who are Kosher and obey the law are holy people.

    c.  During a snowstorm in our about March 2014, Ms. Daniluk was ordered to work in the office (she lives in Queens and had to commute to the Upper West Side) while Ms. Volkowitz and Ms. Shleifstein were able to stay home.

    d.  Jokes and comments were made about Jewish people taking over the world because who has money has power and that Jewish people have power because

they have money, that what still needs to happen is a Jew has to be the President, and that that those who have money really count.

e.  Comments on how President Obama was hated because he did not visit Israel and should have done so.

f.  Ms. Volkowitz telling Ms. Daniluk that she was obliged by her religion to help other Jewish people whenever she can

41.   Other discriminatory statements were made in the workplace, which include but are not limited to:

a.  all the Muslims should be killed to establish order in the world

b.  the Chief Financial Officer being Jewish and that the highly compensated business manager was Jewish and "I have to stick with them [Ms. Volkowitz and Ms. Shleifstein] and not you [Ms. Daniluk]"

c.  a pregnant Jewish teacher who married a non-Jewish man and the failure to have a religious circumcision means that the son will not be Jewish

d.  criticisms of a Jewish woman who married an Italian man and planned to baptize their children

e.  statements about betraying the Jewish nation when Jewish people would marry non-Jews and that a Jewish man should not marry a non-Jew because their children are not Jewish

f.  discussions of Judaism, what it means to be a good Jew and who is not a good Jew

g.  an employee telling Ms. Volkowitz that she can do whatever she wants because she was a Jewish princess

6

h.   that Catholic people must be stupid to believe that Jesus is the son of God

42.     Prior to May 8, 2014, Ms. Daniluk had complained to others at CGPS about the inappropriate statements and her fear of being fired because Ms. Volkowitz wanted to work with Orthodox Jews.

43.     Ms. Daniluk reported her concerns of illegal discrimination to Dr. Soghoian on Thursday, May 8, 2014.

44.     Previously, Dr. Soghoian had told Ms. Daniluk that he made a mistake in allowing Ms. Volkowitz to hire Ms. Shleifstein, another Orthodox Jew.

45.     On May 8, 2014, Ms. Daniluk told Dr. Soghoian of the inappropriate remarks and the increasingly bad and discriminatory treatment by Ms. Volkowitz.

46.     During that meeting, Ms. Daniluk requested another meeting and Dr. Soghoian and Ms. Daniluk set a meeting date for Tuesday, May 13, 2014 to further discuss Ms. Daniluk's complaints about Ms. Volkowitz.

47.     Prior to her May 8, 2014 meeting and request for a further meeting on or about May 13, 2014, Dr. Soghoian and/or Ms. Volkowitz did not ask for the meeting and there had not been any meeting requested by either Ms. Volkowitz or Dr. Soghoian.

48.     Prior to her May 8, 2014 meeting and request for a further meeting on or about May 13, 2014, Ms. Volkowitz had not sought to discipline or terminate Ms. Daniluk.

49.     At the May 13, 2014 meeting, Dr. Soghoian failed to address Ms. Daniluk's discrimination complaint.

50.     Instead, the May 13, 2014 meeting suddenly became about the failure of Ms. Daniluk to notarize a document and the meeting turned into an effort to discipline Ms. Daniluk, which Ms. Daniluk believes was in retaliation for her making a complaint of discrimination.

51.     During the May 13, 2014 meeting, Dr. Soghoian stated that Ms. Volkowitz never previously complained about Ms. Daniluk's performance during prior yearly reviews.

52.     At the meeting, Ms. Volkowitz was confused as to what action was taking place, why there was a meeting and the purpose of the meeting, telling Ms. Daniluk how wonderful she was and but then stating that Ms. Daniluk would be placed on suspension but not terminated.

53.     Then, a little later in the same meeting on May 13, 2014, which Ms. Daniluk had requested to discuss her discrimination complaint, Ms. Volkowitz stated that she would think about termination overnight.

54.     Ms. Volkowitz then fired Ms. Daniluk the next day on May 14, 2014.

55.     After her termination, Ms. Volkowitz demanded that Ms. Daniluk immediately train her co-workers despite Ms. Daniluk being fired for the pretextual reason of poor performance. The stated reason by Ms. Volkowitz for the termination: because Ms. Daniluk did not notarize a parent's signature.

56.     Thus, CGPS suddenly terminated a 61 year old female non-Jewish Polish immigrant, just days after she complained of discrimination, for the alleged failure to notarize a document despite twelve years of service to CGPS, with no negative evaluations, no prior written reprimands or warnings, no performance improvement plan, and with a history of good work with increasing levels of responsibility and pay.

57.     The alleged requirement for Ms. Daniluk to notarize a signature was not part of any written job description.

58.     The alleged requirement for Ms. Daniluk to notarize a signature was not the subject of any disciplinary memo or letter.

59.     The alleged requirement for Ms. Daniluk to notarize a signature was not the subject of

any written annual evaluation.

60.     The alleged requirement for Ms. Daniluk to notarize a signature was not the subject of any oral annual evaluation.

61.     The alleged requirement for Ms. Daniluk to notarize a signature was not the subject of any prior disciplinary meeting between Ms. Daniluk and Ms. Volkowitz.

62.     Ms. Volkowitz and/or CGPS never issued Ms. Daniluk any warning, any disciplinary letter or opportunity for a second chance or progressive discipline prior to her immediate termination.

63.     Upon information and belief, other employees were not immediately terminated and/or received warnings, disciplinary letters or opportunity for a second chance or progressive discipline prior to any termination.

64.     While Ms. Daniluk was told at the time of her May 13, 2014 termination that she would receive three months severance from CGPS, the termination was so rushed that no documentation was provided when Ms. Daniluk was terminated.

65.     To date, Ms. Daniluk never received the promised three months severance pay.

66.     The denial of the promised severance was in retaliation by Defendants for Ms. Daniluk's complaint of discrimination.

67.     Upon information and belief, other CGPS terminated employees actually received severance pay and in larger amounts than that offered to Ms. Daniluk, including but not limited up to two years of severance pay, which Ms. Daniluk was aware of as an employee of the GGPS Business Office.

68.     Thus, Ms. Daniluk reported her complaint of discrimination to Dr. Soghoian and took advantage of the reporting mechanism, which was then ignored and no investigation took place.

69.     By letter dated May 21, 2014, Ms. Daniluk's attorney wrote to Andrew Zaro, President of the CGPS Board of Trustees and Chairman of Cavalry Investments, LLC, to again report Ms. Daniluk's discrimination and retaliation claims and to demand, among other things, an investigation and restoration to her position and for CGPS to cease and desist from the outrageous workplace misconduct and illegal discriminatory treatment.

70.     Upon information and belief, no investigation took place until at least after Mr. Zaro received the May 21, 2014 letter.

71.     After Mr. Zaro's receipt of the May 21, 2014 letter, and upon information and belief, Defendant sought out information to try and discredit Ms. Daniluk, including seeking statements from co-workers and others about incidents for which Ms. Daniluk had never been approached about, notified and/or disciplined and was apparently irrelevant up until her termination.

72.     By letter dated March 15, 2014, CGPS intended for Ms. Daniluk to return for the 2014-15 school year (July 1, 2014 to June 30, 2015) with a 4½% salary increase.

73.     Upon information and belief, CGPS engaged in this cover up of its discriminatory and retaliatory actions because it did not have a legitimate non-discriminatory basis for Ms. Daniluk's termination.

74.     Yet, during the time of Ms. Daniluk's employment, other employees had refused to perform certain actions but had not been terminated or disciplined, including but not limited to refusing to perform certain actions and searching for student information in a student billing system, or having loud arguments and disagreements in the office.

75.     During the time of Ms. Daniluk's employment, other CGPS employees had openly criticized Ms. Volkowitz but had not been terminated or, upon information and belief, disciplined by Ms. Volkowitz and/or CGPS.

76.     Defendant then sought to use these post-termination allegations to concoct and support the CGPS false claim of insubordination that otherwise did not exist at the time of Ms. Daniluk's termination.

77.     CGPS sought this after acquired evidence in retaliation for Ms. Daniluk's complaints of discrimination an in an effort to try and limit its damages for its illegal discrimination of Ms. Daniluk.

78.     Further, CGPS sought out information to try and discredit Ms. Daniluk, including seeking statements from co-workers about incidents for which Ms. Daniluk had never been approached about or disciplined.

79.     CGPS then submitted these concocted post-termination allegations to the United States Equal Employment Opportunity Commission, the timing of which was made obvious by (for example) the post-termination date of a witness statement.

80.     At the same time, in its position statement, CGPS, Dr. Soghoian and Ms. Volkowitz did not deny that the discriminatory statements submitted to the U.S. Equal Employment Opportunity Commission were made.

81.     As a result of illegal discrimination and harassment and retaliatory and in violation of applicable law and CGPS policies, Ms. Daniluk suffered significant stress, anxiety and pain.

82.     CGPS did not take reasonable care to prevent and correct promptly the wrongful behavior.

83.     Upon information and belief, CGPS did not investigate Ms. Daniluk's claim of discrimination and retaliation and has not sought to discipline the wrongdoers or remedy the illegal discrimination.

84.     Ms. Daniluk was not and is not restored to her position at CGPS.

85.     Ms. Daniluk suffered loss of wages and benefits as a result of her illegal termination from CGPS.

### FIRST CAUSE OF ACTION
### CGPS Only

86.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-__ as if fully set forth herein.

87.     Defendant has discriminated against Ms. Daniluk on the basis of age, sex and religion and has subjected Ms. Daniluk to working in a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

### SECOND FIRST CAUSE OF ACTION
### CGPS Only

88.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-__ as if fully set forth herein.

89.     Defendant has retaliated against Ms. Daniluk for complaining of discrimination, and has subjected Ms. Daniluk to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

### THIRD CAUSE OF ACTION

90.     Plaintiff repeats and realleges the allegations of paragraphs 1-__, supra, as if fully set forth herein.

91.     Defendants have discriminated against Ms. Daniluk on the basis age, sex and religion and has subjected Ms. Daniluk to working in a hostile work environment in violation of the New York State Human Rights Law, Exec. Law §296, et seq.

### FOURTH CAUSE OF ACTION

92.     Plaintiff repeats and realleges the allegations of paragraphs 1-__, supra, as if fully set forth herein.

93.     Defendants have retaliated against Ms. Daniluk for complaining of discrimination, and has subjected Ms. Daniluk to unequal and unfair treatment in violation the New York State Human Rights Law, Exec. Law §296, et seq.

## FIFTH CAUSE OF ACTION

94.     Plaintiff repeats and realleges the allegations of paragraphs 1-__, supra, as if fully set forth herein.

95.     Defendants have discriminated against Ms. Daniluk on the basis of her age, sex and religion and has subjected Ms. Daniluk to working in a hostile work environment in violation of the New York City Human Rights Law, Administrative Code of the City of New York, 8-101, et seq.

## SIXTH CAUSE OF ACTION

96.     Plaintiff repeats and realleges the allegations of paragraphs 1-__, supra, as if fully set forth herein.

97.     Defendants have retaliated against Ms. Daniluk on the basis of her age, sex and religion and has subjected Ms. Daniluk to working in a hostile work environment in violation of the New York City Human Rights Law, Administrative Code of the City of New York, 8-101, et seq.

## SEVENTH CAUSE OF ACTION

98.     Plaintiff repeats and realleges the allegations of paragraphs 1-__, supra, as if fully set forth herein.

99.     Ms. Volkowitz and Dr. Soghoian coerced, intimidated, threatened, aided, abetted, incited, compelled, interfered and/or coerced the doing of acts forbidden under the New York Executive Law, or attempted to do so, in violation of the New York Executive Law §§290 et seq., and specifically §296(6) and/or the New York City Administrative Code, §§8-101 et seq., and

specifically §8-107.

**WHEREFORE**, Ms. Daniluk respectfully requests that this Court enter a judgment:

A.  Declaring that Defendants' conduct violated Title VII of the Civil Rights Act of 1964, as amended; the New York State Human Rights Law; and the New York City Human Rights Law;

B.  Enjoining Defendants from engaging in further acts of unlawful discrimination and retaliation;

C.  Ordering Defendants to reinstate Ms. Daniluk, to restore plaintiff to full seniority with full back pay and benefits to make her whole, and to cease and desist from any and all acts of discrimination and retaliation against Ms. Daniluk;

D.  In the alternative to reinstatement, ordering Defendants to pay Ms. Daniluk front pay in an appropriate amount to fully compensate her for lost income and benefits, together with back pay and benefits to make her whole;

E.  Compensatory damages in an appropriate amount to compensate plaintiff for all of her physical and emotional pain and suffering; physical, personal injury; and damage to career.

F.  Punitive damages in the appropriate amount;

G.  Reasonable attorneys' fees;

H.  Costs and disbursements of this action; and

I.  Granting Ms. Daniluk such other, further and different relief as may seem just, proper and equitable.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury in this action.

Dated:          New York, NY
                August 19, 2015

                                    STEVEN S. LANDIS, P.C.


                                    _____/s/_____
                                    By:  Steven S. Landis
                                    485 Madison Ave., Suite 1301
                                    New York, NY 10022
                                    (212) 308-5035
                                    steve@stevenlandis.com
                                    Attorney for Plaintiff